## JASPER COUNTY v. OSBORN.

1. **Pauper:** MAINTENANCE BY SON. The son of a poor person, unable to maintain himself by work, is liable to the county for money expended in support of such poor person upon the order of the township trustees, and may be compelled by order of court to support him.

2. **Practice in the Supreme Court:** OBJECTION NOT RAISED BELOW. A defense not pleaded and an objection not raised in the court below cannot be heard for the first time in the Supreme Court.

3. **Pauper:** WHO IS. Although a man has a homestead right in forty acres of land, and is the owner of certain personal property kept on said land, yet if he is aged, infirm, and otherwise destitute, and unable to maintain himself by labor, and his homestead and personal property are in the control of his wife and children, who by their cruel and inhuman treatment, make it impossible for him to live at home, or, without litigation, to control or enjoy his personal property, he is a "poor person" in contemplation of the statute. ADAMS and SEEVERS, JJ., from their views of the evidence, *dissenting.*

4. ———: ACTION FOR MAINTENANCE. While the wife of such a person is liable to the county for his support, or to any citizen who might take care of him, yet the county may waive its right of action against her and pursue its remedy against the son.

5. **Evidence:** FACTS NOT OPINIONS. Witnesses who are not experts, can be heard to state facts only, not opinions.

*Appeal from Jasper Circuit Court.*

THURSDAY, JULY 13.

THIS action was brought to recover money expended upon the order of the township trustees for the support of John Osborn, father of defendant, alleged to be a poor person, who is unable to maintain himself by work, and praying for a judgment and order of the court requiring and compelling defendant to support his father. There was a judgment granting the relief sought in plaintiff's petition. Defendant appeals.

*H. S. Winslow*, for appellant.

*Smith & Wilson*, for appellee.

BECK, J.—I. Henrietta, the mother of defendant and wife of John Osborn, was joined as defendant in the action. She

with her son Henry, answered the petition alleging that John, the father and husband, had left his house voluntarily; that the wife at the time of her marriage owned all the property, "and with this property all the lands were purchased," and that the husband by imprudence squandered a large part of "their means," to which course of conduct the wife made objection, which gave offense to the husband and he thereupon became harsh and cruel. They declare in their answer, "that now and always, so long as he shall behave himself, and will share with defendants their house, he can do so, and defendants now here, as they have heretofore done to the trustees, tender to him their home and support." Pending the trial the cause of action as to Henrietta was dismissed.

The court made and filed a finding of facts from which it appears that application as required by law had been made to the township trustees for board and clothing for John Osborn, which were supplied to the value of $48, and that certain notices were given by the trustees to defendant. The other findings of the court which need be presented here, are in the following language:

"3. That at the time of applying for and receiving said relief, board and clothing, John Osborn was, and still continues, a poor person, unable to maintain himself by work.

"4. That said defendant, Henry Osborn, the son of said John Osborn, is twenty-seven years old and unmarried, living with his mother, John Osborn's wife, on her farm in Fairview township.

"5. That up to the time of said John Osborn's application to said trustees, as aforesaid, he had been living with his wife and son, Henry Osborn, the defendant, but said John Osborn was not then being maintained by them, or either of them, in the manner which his necessities and condition required, nor had either so maintained him for some months past.

"6. For some years immediately preceding December 6th, A. D. 1880, Henry Osborn and his mother on the one side, and the father and husband on the other, had frequent and

VOL. LIX—14

bitter quarrels, which sometimes led to personal violence; but who, if any one of them has been the most to blame does not clearly appear. John Osborn, however, being sixty-nine years old, and quite infirm and sometimes sick, was compelled to, and did, yield the control of the household, farm and business to his son, Henry Osborn, and his wife, Henry's mother, who appear to have been industrious and frugal.

"7. That at said December 6th said John Osborn had, has now, perhaps, the right to some personal property such as is usually found on a farm, but what it or its value was or is, does not clearly appear. It had all slid into the possession of, or had been by superior force taken possession of, by Henry Osborn and his mother, so that John Osborn was not then, and has not since been, in the control or possession of any property of any sort, real or personal. Said defendant, Henry Osborn, is not now, and has not been at any time since December 6th, A. D. 1880, of ability, without personal labor, to maintain his father, said John Osborn, in the manner which his necessities and condition require.

"8. That said John Osborn has besides the defendant, Henry, another son of age and in business for himself, but not a resident of Jasper county, and a daughter Julia and son Charles, both minors, living with Henry and their mother in Fairview township."

II. Counsel for defendant insist that upon the facts found the court ought not to have rendered the judgment against defendant. The third finding is that "John Osborn was, and is, a poor person, unable to maintain himself by work," and by the fourth the court finds that defendant is his son. Under these findings the defendant is liable for the support of his father. Code, § 1330.

1. PAUPER: maintenance by son.

III. Counsel for defendant also urge that as the seventh finding shows that defendant is not "of ability, without personal labor, to maintain his father," he is not shown to be able to render the support required, and therefore judgment ought not to have been

2. PRACTICE: in supreme court: objection not raised below.

rendered against him. But no such defense was pleaded in the answer, and no such objection was raised in any form in the court below. It cannot be first raised in this court.

IV. It is also urged that the evidence fails to support the finding of the court that John Osborn was a poor person for whose support the law will hold his son liable.

3. PAUPER: who is.

The objection is based upon the ground that the evidence discloses the facts to be that he is the owner of certain personal property, and has a homestead interest in the forty acres of land occupied by the family as a home. The fifth and sixth findings of fact are well supported by the testimony. It is true that he has the lawful right to occupy his homestead and to hold the possession of certain personal property. But by the violence and ill treatment of his wife, defendant, and his other children, he was driven from his home and deprived of the use and benefits of his personal property The testimony tends do show the most brutal treatment toward the husband and father by the wife and children. He was more than once assaulted by defendant, who was fined on one occasion for the offense; the wife threw buckets of water upon him; and the daughter, who seems to have had an organ in the parlor, forbid him to enter that room, and the younger son, a lad of thirteen, threw clods of dirt upon him, and all habitually used towards him abusive language. He was kept in the cellar and required to sleep there and refused money to buy necessary articles for his comfort, and, in short, was treated with violence and indignity, the recital of which would not fail to shock human sensibility. The family charge that he was cross and unpleasant. We wonder how he could be expected to be otherwise, surrounded as he was, by such tormentors of his own blood and family. He was sixty-nine years of age, infirm of health, being a cripple from diseased legs. Such being his physical condition, he found it necessary, in order to escape the torture inflicted upon him by his own family, to leave his own house, even though starvation threatened him away from home.

His wife had coerced him into giving her a deed of their land, eighty acres. She, and her son, had assumed control of all his personal property. Of course the law secures to him a right to occupy his homestead with his family, but their violence rendered that impossible. The title of the personal property was in him, but the son had it in possession. His wife and son would give him no money. They agreed in writing with the trustees, before this suit was brought, to permit him to return to their home, and that they would pay him one dollar a month to enable him to buy necessary articles of comfort. But he could not remain at home and the one dollar a month was not paid him. The right to the homestead and to the personal property, unless they were enforced by proceedings at law, would give him neither shelter nor food. He had no money to institute actions to enforce his rights, and could he have done so without money, he would have starved before he could have realized support in that way, did no other means exist for providing him with food. It is said that his property and rights gave him credit which he ought to have used for his own support. We think the helpless old man, a refugee from the cruelties of his family, would have little credit on account of the property withheld from him by his family.

It would be a reproach to our laws if one so destitute, so afflicted with disease, and the worse affliction of an ungrateful and cruel family, would be refused the support given paupers. He was destitute and in want; he had no money or other means that could be applied to his support. He was a "poor person" in the most destitute condition. The law contemplates that the children of such persons shall be liable for their support. Code, § § 1330, 1333.

V. It is urged that the wife of Osborn was liable for his support and therefore he was not authorized to call upon the county. But the difficulty in the way of this position is, that while depending upon her for support he would have starved. His right to claim support

4. ——: action for maintenance.

from her, like his right to occupy his house, could not have been enforced except by appeal to the law. While enforcing this right he required food and shelter. Doubtless, she would be liable for his support to the county or to any citizen who would humanely take care of him. But the county may pursue its remedy against the defendant and waive its remedy against the wife.

We think *Stewart v. Sherman*, 5 Conn., 244, is hardly in conflict with these views. It appears that the plaintiff in that case, who had rendered support to the alleged pauper, held a note belonging to the pauper; at least such was claimed to be the fact by the defendant. The court held that if the pauper had an estate he was bound to support himself, and the town could not be charged for his support. But the case does not meet the facts before us, namely, that the pauper while holding a right to occupy his homestead was driven from it, and his wife and family, while, in law and morals, they were bound for his support, refused to discharge their duty in this respect, and that he would have been exposed to suffering and starvation had he not received support from the township trustees. It must be remembered too, that in the case just cited the person granting relief to the pauper seeks to recover from the town; in this case the county having voluntarily rendered support to the pauper, seeks to recover therefor from his son, whom the law holds liable for his father's support.

VI. Defendant offered as a witness in his behalf his sister Julia, who was a member of John Osborn's family. He asked her "if it was not for his own conduct, whether her father could not live at home?" The witness was not permitted to answer this question. The ruling is correct. It sought to elicit an opinion of the witness. She was authorized to state facts, and not opinions, based upon facts. The foregoing discussion disposes of all questions in the case. The judgment of the Circuit Court is

*5. EVIDENCE: facts, not opinion.*

AFFIRMED.

ADAMS, J., *dissenting*.—The findings of the court do not in my opinion show that John Osborn was a "poor person" within the meaning of the statute. The findings show affirmatively that he had "the right to some personal property such as is usually found on a farm." Mrs. Osborn in her testimony says:. "We have hogs, cattle, and horses; we have stock." The holding that he is a "poor person" appears to be based upon the idea that he has been deprived of the possession of his property. But it is not so found by the court nor does the evidence so show. The finding is that the personal property "had all slid into the possession of, *or* had been by superior force taken possession of by Henry Osborn and his mother." The court did not find positively that any force had been used, and I am unable to discover any evidence that there had been. Mrs. Osborn in speaking of her husband said: "He has had as much control of the property the last two years as any one if he wants to," and I am not able to find any evidence to the contrary. The defendant Henry Osborn appears to have been at work upon the farm as an employe. The undisputed evidence shows that the work was done upon the farm mainly by Mrs. Osborn and her children, and that the defendant Henry took the lead. To this extent the personal property had slid into the possession of Henry and his mother. But while Osborn was living with his family, he appears to have been in the possession of his property in the same sense that any farmer is in possession of his property upon his farm, while living with his family upon the farm, but on account of bodily infirmity not participating to any great extent in its care or management. The evidence, I think, does not show that.he was ever denied the right to make sale of what they had to sell, if he chose to exercise the right. It is shown, indeed, that he did sometimes exercise such right and receive the money. He was not unable to do so, and his omission to do so appears to have been a matter of his own volition. I cannot, then, attach much importance to the finding that the

property on the farm had slid into the possession of Mrs. Osborn and the defendant Henry.

The majority opinion proceeds upon the theory that Osborn was driven from home, or at least that he was justified in leaving it; but the court below did not so find, and I think could not properly have done so upon the evidence. It may be conceded that the evidence shows that Osborn's family did not at all times use proper language toward him. But it was not wholly the fault of the family. Osborn was addicted to drink, and quarrelsome; and while he said in his testimony: "I have as much affection for my wife as men generally have for their wives," the undisputed evidence shows that he struck her at four different times, and for years threatened to kill her. He admits that he made such threats, and it is proven that he told his neighbors that he intended to kill her, and also intended to kill his son Henry.

The majority opinion states that Henry struck his father and was fined for it. This is not denied. But if this fact is of any importance as tending to support the ruling that Osborn was a proper subject for county relief, it ought to be stated that there were mitigating circumstances. On one occasion when the family was at table, one of the too frequent family altercations occurred. Osborn was about to strike his wife with a chair when Henry struck him with his open palm upon the face. This is all the violence, I think, which the evidence shows was inflicted by Henry or his mother. It is true Osborn testifies that his wife threw water upon him, but she denied it, and the court below made no such finding. He testified that he was kept in a cellar. But what he called a cellar appears to have been a basement room, with half windows above ground, and furnished with a stove and a little other furniture. Besides, according to the testimony of three witnesses, each as credible as he is, he was not kept there, but had the freedom of the house, and occupied the basement when he did occupy it, only from choice. The court, indeed, found that "the defendant and his mother

have offered, and have at all times been willing to maintain said John Osborn in sickness and in health as they do themselves." This shows that he had the freedom of the house and shared with the other members of the family in whatever comforts they enjoyed. It is true that the court found that in sickness Osborn was not furnished with what he needed. The evidence shows that at one time Osborn was sick and thought he needed a physician, but the other members of the family thought otherwise and no physician was called. The sickness does not appear to have been a serious one. He recovered, and was not justified I think in leaving home upon such ground.

There are some statements made in the opinion as to the treatment which Osborn received from his younger son, about fourteen years old, called Charlie. On one occasion it appears that Charlie threw some clods of dirt at him. Whether this was done in pleasantry or a quarrel does not appear, but we presume it was in a quarrel. Yet Henry testifies that Charlie was his father's best friend. I do not think that. Osborn was justified in leaving home. The evidence shows that there had been no unkindness or trouble for several weeks before he left. He admitted this, and stated that he did not think of applying for county aid when he left.

But if he had been justified in leaving home, I do not think that for that reason he could be deemed a "poor person" within the meaning of the statute, regardless of the amount of property of which he was the owner.

Сн. J. SEEVERS concurs with me in this dissent.